**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **PSC METALS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:14-cv-02019** |
| | ) | **Judge Aleta A. Trauger** |
| **SHELBY LAND COMPANY LLC,** | ) | |
| **EMILY MAGID, and ELISE SMALL,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>MEMORANDUM</u>

Before the court are cross-motions for partial summary judgment filed, respectively, by plaintiff PSC Metals, Inc. ("PSC") (Doc. No. 54) and defendants Shelby Land Company LLC, Emily Magid, and Elise Small ("landowners") (Doc. No. 72). For the reasons set forth herein, the court will deny PSC's motion and grant the landowners' motion.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

On August 1, 1979, Richard J. Eskind ("Original Lessor") leased to Steiner-Liff Iron & Metal Company ("Original Tenant") approximately 19.5 acres of real property and the buildings and improvements located thereon (the "Leased Premises"). (Defs.' Resp. to Pl.'s Statement of Undisp. Facts ¶ 1, Doc. No. 67; August 1, 1979 Lease ( "Lease"), Doc. No. 58-1.) Through a series of assignments and mergers of various entities, the rights and obligations of the Original Lessor and Original Tenant have come to be held by PSC as tenant and the landowners as lessor. (Doc. No. 67 ¶ 2.)

The Leased Premises are part of PSC's considerable scrap metal recycling operation, which is based out of 710 South 1st Street in Nashville, Tennessee. (*Id.* ¶ 3.) PSC's Nashville

operation covers approximately forty-five acres of land, of which roughly half are owned by PSC and three are leased to PSC by a non-party. The Leased Premises constitute the remainder. (*Id.* ¶ 4.) PSC's operation, including the Leased Premises, tracts leased from others, and parcels owned by PSC, is located within a triangle of land bordered on the south by the Cumberland River, on the west and northwest by Korean Veterans Boulevard and Shelby Avenue, and on the east by I-24. (*See* Property Map, Doc. No. 58-2.)

The Lease defines the Leased Premises as the real property described in Exhibit A to the Lease, "[t]ogether with all buildings and improvements now on said land or placed or constructed thereon prior to the expiration of this lease." (Lease ¶ 1, Doc. No. 58-1).) Thus, under the Lease, PSC leases "not only . . . the dirt, but all the buildings associated with operating an industrial scrap metal recycling business on the property." (Doc. No. 67 ¶ 11.) PSC is obligated under the Lease to "maintain" the Leased Premises, for the duration of the Lease term, in "as good a condition and state of repair and preservation as at the commencement of the term, ordinary wear and tear excepted." (Lease ¶ 3.b.) The parties have never interpreted this provision to mean that PSC cannot make modifications or additions to the existing buildings and improvements or to construct new buildings and improvements. Since 2011, PSC has performed $1.5 to $2.5 million in alterations to the property it controls on the east bank of the Cumberland River, which includes the Leased Property. (Doc. No. 83 ¶ 30.) Moreover, other than requiring the maintenance and preservation of the buildings already on the property at the time of the inception of the Lease, the Lease does not limit or even address the use of the premises by the tenant. The Lease expressly authorizes the tenant to sublease the premises or assign the Lease, "upon written consent of the Lessor, which consent shall not unreasonably be withheld." (Lease ¶ 7.)

The "initial term" of the Lease is 45 years, from August 1, 1979 to August 1, 2024. (Lease ¶ 2.) After the expiration of the initial term, PSC will have "four (4) successive options to renew this Lease." (*Id.*) The first three options are for ten-year terms and the final option is for an eleven-year term, giving PSC the exclusive right under the Lease to rent the Leased Premises until 2065. (*Id.*)

For the first twenty-five years of the initial term of the Lease (1979–2004), the rent was fixed at $98,000 per year, payable in equal monthly installments of $8,166.67 per month. (Lease ¶ 3.) For the remaining two ten-year periods of the initial term, from August 1, 2004 through July 31, 2014 and from August 1, 2014 through July 31, 2024, "rent shall be due and payable at the greater of [$98,000] per annum or fourteen percent (14%) *of the appraised value of the leased premises as determined at the inception of each such ten-year periods* [sic] respectively, and said rental [sic], when so determined, shall remain in effect for each of said two ten-year renewal terms." (Lease ¶ 3.a (emphasis added).) Likewise, if PSC exercises its option to renew the Lease after August 2024, rent "shall be payable for each of said periods at the rate of fourteen percent (14%) of the appraised value of the leased premises determined at the inception of each such renewal term," but in no event less than $98,000 per annum. (*Id.* ¶ 3.b.) The Lease does not prescribe a method for calculating the "appraised value" of the Leased Premises.

In accordance with the Lease, PSC paid $98,000 per year in rent to the landowners from 1979 to 2004. As the deadline for recalculating the rent approached, the parties presented each other with competing appraisals.[1] (Doc. No. 67 ¶ 23.) Although their appraisals were fairly far apart in value, PSC and the landowners were able to reach an agreement on rent for the ten-year term from August 1, 2004 to July 31, 2014. (*Id.* ¶ 24.) PSC paid rent when and as due under the

_____

[1] The parties' respective appraisers valued the land at $4,130,000 (landowners' appraisal) and $3,200,000 (PSC's appraisal). (Compl. ¶¶ 23, 29; Answer ¶¶ 23, 29.)

Lease throughout that period. (*Id.* ¶ 25.)

In 2014, when the rent was scheduled to be adjusted again for the last ten-year period of the initial term of the Lease, PSC and the landowners again exchanged competing appraisals. This time, however, they have been unable to reach an agreement as to the value of the Leased Premises or, as a result, the amount of rent PSC is required to pay. (*Id.* ¶ 27.) The landowner's appraisal, prepared by CBRE, Inc. ("CBRE"), valued the Leased Premises at $12,430,000, which would require annual rent in the amount of $1,740,200, or monthly rent of $145,016.67. (Compl. ¶ 34; Answer ¶ 34.) In conducting the appraisal, CBRE concluded that the highest and best use of the Leased Premises was a mixed use and appraised the property as if it were already zoned for mixed use. (Compl. ¶ 36; Answer ¶ 36.) PSC obtained an appraisal from Philip R. Russ. Russ's appraisal concluded that the highest and best use of the Leased Premises is an industrial use, consistent with existing zoning and long-term historic use. He valued the Leased Premises at $3,650,000. (Compl. ¶ 43; Answer ¶ 43.) Rent calculated based on Russ's 2014 appraisal would be $511,000 annually, or $42,583.33 monthly. (Compl. ¶ 44; Answer ¶ 44.) Beginning August 1, 2014, PSC has paid, under protest, the rent demanded by the landowners, with the amount of rent due subject to adjustment and a "true-up" per a Rent Reconciliation Agreement once this dispute is resolved. (Compl. ¶ 46; Answer ¶ 46; Doc. No. 67 ¶ 29.)

The Leased Premises consist of four separate tracts, only partially contiguous. (*Id.* ¶ 5; *see also* Property Map, Doc. No. 58-2.) The largest is bordered on the north by PSC's scrapyard and partially bordered on the south by the scrapyard. (Doc. No. 67 ¶ 6.) Other businesses and occupants in the immediate vicinity of PSC's operation include a storage center and warehouses, a "go kart" company, a petroleum company, and a pipeline company. Some of the parcels in the immediate vicinity are zoned as industrial and some are zoned for mixed use. (*Id.* ¶ 6.)

The Leased Premises are currently zoned for industrial use. (*Id.* ¶ 7.) As discussed in more detail below, PSC insists that the Lease, properly construed, conveys a clear intent that the Leased Premises be maintained for industrial purposes and appraised as such. (*See* Pl.'s Reply to Defs.' Resp. to PSC's Statement of Undisp. Material Facts ¶ 3 at 3, Doc. No. 83.) The landowners dispute that assertion and contend that there is a reasonable likelihood that the Leased Premises could be rezoned for mixed use upon request. (Doc. No. 67 ¶ 7.) They point to Metro Nashville's plan for the neighborhood as strongly favoring a transition to mixed use. (*See General Plan for Nashville & Davidson County*, adopted by the Metro Planning Comm'n in June 2015 (the "General Plan") at DT 72, Doc. No. 69-2, at 10 (calling the East Bank South Neighborhood a "prime location for a future mixed use neighborhood" and stating that there is a "strong preference for mid- and high-rise development within this area to buffer the effects of the interstate system"); Poore Decl. ¶ 10, Doc. No. 71 (stating that the zoning for a 10.4 acre parcel adjacent to the scrapyard (400 Davidson Street) was changed from industrial to mixed use in 2013).)[2]

While the Leased Premises have been used for conducting a scrap metal operation since the inception of the Lease, the landowners dispute that PSC has used the Leased Premises exclusively for the scrap operation. They point out that, for at least a decade, PSC has earned approximately $90,000 to $100,000 per year by running a parking operation on part of the property it controls on the east bank of the Cumberland River, including part of the Leased Premises, during events at the nearby Titans football stadium. (Pl.'s Resp. to Defs.' Statement of

---

[2] PSC points out that much of the Leased Premises falls within a flood plain. (Doc. No. 55, at 3 n.3 (citing http://maps.nashville.gov/PrelimFEMAViewer/# (showing that part of the Leased Premises is in the 100 Year Floodplain and the remainder is in the 500 Year Floodplain).) The site apparently experienced severe flooding in 2010. *See id.* (citing http://maps.nashville.gov/May2010Flood/ and http://s3-media3.fl.yelpcdn.com/bphoto/teGb1bSpbGx6aYhW-jv38g/o.jpg).) Neither party discusses the effect of floodplain designation on the possibility of rezoning and development.

Add'l Facts ¶¶ 26, 27, Doc. No. 83.) PSC did not obtain permission from the landowners to conduct the parking operation, and neither party interprets the Lease as requiring it to ask for such permission. (*Id.* ¶¶ 28, 29.)

The landowners have introduced additional evidence suggesting that PSC began thinking about trying to relocate its Nashville scrap yard in 2011, that it was still discussing that possibility internally in 2012 and 2013, and that, as late as November 2015, it was considering acquiring Southern Recycling, which would give PSC greater flexibility to vacate the Nashville scrap yard. (Pl.'s Resp. to Defs.' Statement of Add'l Facts ¶¶ 1–7, Doc. No. 83.) In a memorandum discussing this possibility, PSC provides its own "high end," "midpoint" and "low end" values for the Leased Premises, ranging from $35.7 million (high) to $14.2 million (low). (*Id.* ¶ 14 (citing Project Kingpin Memo., Doc. No. 68-4.).) The same memorandum discusses the possibility of developing the property on which PSC's business is located, including the Leased Premises, or selling to a developer. (*Id.* ¶¶ 11–13.) The memorandum assumes that the entire site occupied by PSC can be zoned for mixed use and acknowledges that it "has been the target of development plans by the City of Nashville for several years. (Doc. No. 68-4, at 16.)

The landowners contend that there is at least a question of fact as to whether PSC intends to relocate its scrapyard from the Leased Premises in order to capitalized on property values on the east bank of the Cumberland River. (Doc. No. 83 ¶ 16.) PSC concedes that it considered the possibility of relocating, with the outcome of that decision dependent upon a variety of factors, including actions by third parties over whom it has no control. (*Id.*)

In 2007, Tower Investments entered into an Option Agreement to purchase the Leased Premises from the landowners for $16 million. (Doc. No. 69-10.) The option expired and no purchase occurred. In 2016, Tower Investments again informed the landowners that it was

interested in purchasing the Leased Premises and agreed to a price of $20 million. The parties did not reach an agreement on other terms and the sale did not occur. (Doc. No. 83 ¶ 20.)

PSC filed this lawsuit in October 2014, seeking, among other things, a declaratory judgment that the Leased Premises must be appraised based on industrial use. (Compl. ¶ 9, Doc. No. 1.) The landowners answered, denying liability and seeking, among other things, a declaration that the Leased Premises are not required to be appraised as industrial property.

PSC filed its Motion for Partial Summary Judgment in July 2016. The parties agreed to extend the time for the landowners to respond to the motion until December 2016. The landowners have now responded and filed their own Motion for Partial Summary Judgment. The motions have been fully briefed and are ripe for review.

## II.    LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment on a particular claim by an adverse party, the moving defendant must show that there is no genuine issue of material fact as to at least one essential element of that claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citations omitted).

## III.   ANALYSIS

PSC's motion presents the issue of "whether, as a matter of law, any rent-determinative appraisal of the Leased Premises called for by the Lease must value the Leased Premises consistent with PSC's contractual right to decades of future industrial use." (Doc. No. 55, at 6.) PSC argues that Tennessee law, as well as authority outside Tennessee, dictates that a property appraisal based on fair market value "must be based on the 'use' and related encumbrances of the property at the time that such property is appraised." (Doc. No. 55, at 8.) It argues that, because the Leased Premises have been used as industrial property for many decades, are adapted to that use, are zoned for that use, and, under the Lease, must be maintained as such for the duration of the Lease term—and longer if PSC exercises its options to extend the Lease term—"any

appraisal must value the Leased Premises for an industrial 'use.'" (*Id.*)

In response, the landowners argue that (1) material factual disputes preclude summary judgment in PSC's favor; and (2) as a matter of law, the property must be appraised in fee simple at its highest and best use. Similarly, in their own Motion for Summary Judgment, the landowners argue that, as a matter of law, the property must be appraised in fee simple at its highest and best use, and they incorporate by reference the argument and legal citations set out in their response to PSC's motion.

As an initial matter, the court finds that there are no material factual disputes. The question presented by the parties' motions is one of law: the interpretation of the Lease. Accordingly, the court will first address general principles of Tennessee law regarding the interpretation of contracts and then apply those principles to the agreement at issue here to rule on the parties' motions.

A.      General Principles of Tennessee Contract Law

In "resolving disputes concerning contract interpretation, [the court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)).    The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Id.*

The determination of the parties' intent is generally a question of law, because the words of a written contract are definite and undisputed. *Id.* (citing 5 Joseph M. Perillo, Corbin on Contracts § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). The parties' intent is presumed to be that specifically expressed in the body of the

contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (quoting 17 Am. Jur. 2d *Contracts* § 245). If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes.

If the language of the contract is ambiguous, courts cannot simply enforce the contract according to its plain meaning. *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001). Ambiguity, however, does not arise "merely because the parties may differ as to interpretations of certain of its provisions." *Id.* (citation omitted). Rather, "a contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.'" *Planters Gin*, 78 S.W.3d at 890 (quoting *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190–91 (Tenn. 1973)).

A mere "agreement to agree" is unenforceable under Tennessee law. *Four Eights, LLC v. Salem*, 194 S.W.3d 484, 487 (Tenn. Ct. App. 2005). For a contract to be enforceable, the parties must agree on the material terms. *Gurley v. King*, 183 S.W.3d 30, 35 (Tenn. Ct. App. 2005). Tennessee courts, however, do "not favor the destruction of contracts because of indefiniteness[,] and if the terms can be reasonably ascertained in a manner prescribed in the writing, the contract will be enforced." *Four Eights*, 194 S.W.3d at 487. Accordingly, "where price is the unspecified material term, courts have enforced contracts that call for the price to be set by vague but ascertainable standards, such as 'market price' or 'prevailing rate.'" *Huber v. Calloway*, No. M2005-00897-COA-R3-CV, 2007 WL 2089753, at *5 (Tenn. Ct. App. July 12, 2007); *see also First Nat'l Bank v. Duckworth*, 502 So. 2d 709, 710–11 (Ala. 1987) (finding that a lease was "ambiguous as to whether the existence of the lease itself is to be considered in arriving at the

'value of the leased premises,'" for purposes of setting rent, but that the contract could be construed and enforced according to the parties' intent as gathered from the contract as a whole, the parties' actions, and the subject matter of the lease).

### B. PSC's Motion

The Lease does not define the term "appraised value," but the parties apparently agree that an appraised value is a "theoretical sales price based on fair market value." (Pl.'s Mem. Supp. Mot. Summ. J., Doc. No. 55, at 7; Defs.' Resp., Doc. No. 66, at 15 (noting that the Illinois Supreme Court construed the term "cash value" as used in a lease to mean "fair cash market value" (citing *Giddens v. Bd. of Educ.*, 75 N.E.2d 286, 293 (Ill. 1947)).) The court likewise finds that the term "appraised value," without other adornment, must mean fair market value. *Accord* Black's Law Dictionary (10th ed. 2014) (defining "appraisal" as "[t]he determination of what constitutes a fair price for something or how its condition can be fairly stated; the act of assessing the worth, value, or condition of something"); *Bullock's, Inc. v. Sec.-First Nat'l Bank of L.A.*, 325 P.2d 185, 188 (Cal. Ct. App. 1958) ("When the parties referred to the 'value' of the land in question they meant its monetary worth or marketable price—i.e., its market value.").

The Tennessee Supreme Court has defined "fair market value" as "the price that a reasonable buyer would give if he were willing to, but did not have to, purchase and that a willing seller would take if he were willing to, but did not have to, sell." *Nashville Hous. Auth. v. Cohen*, 541 S.W.2d 947, 950 (Tenn. 1976). Although *Nashville Housing* applied that definition in the context of eminent domain/condemnation, other Tennessee courts have used the same definition in a variety of settings. *See, e.g.*, *Wayland-Goodman Props., LP. v. Southside Package Store, Inc.*, No. E2009-01550-COA-R3-CV, 2010 WL 1404399, at *3 (Tenn. Ct. App. April 8, 2010) (defining "fair market rental value" based on *Nashville Housing's* definition of fair market

value); *Kyle v. J.A. Fulmer Trust*, No. W2008-00220-COA-R3-CV, 2008 WL 5156306, at *8 (Tenn. Ct. App. Dec. 9, 2008) (applying *Nashville Housing*'s definition to the term as used in a purchase option in a lease); *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 229 (Tenn. Ct. App. 2006) (applying *Nashville Housing*'s definition of fair market value in the context of a lawsuit alleging breach of a real estate contract). *Accord Eastman Credit Union v. Bennett*, No. E2015-01339-COA-R3-CV, 2016 WL 1276275, at *5 (Tenn. Ct. App. Mar. 31, 2016) (defining fair market value as "the price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect" (citing Black's Law Dictionary (10th ed. 2014))).

Here, the parties do not appear to dispute that rent should be based upon a percentage of the fair market value of the Leased Premises, but they disagree about what elements should be considered in determining fair market value. In its motion, PSC argues that the Leased Premises must be valued based on the current zoning for industrial use. It also appears to argue that the effect of the Lease itself on the Leased Premises must be taken into account in assessing the value.

### 1.    *Whether the Premises Must Be Valued as Zoned for Industrial Use*

In *Nashville Housing*, the Tennessee Supreme Court was specifically called upon to address the question of whether the fair market value of the property in that case had to be assessed based on the property's *current* zoning, or whether the factfinder—in that case, the jury—should also consider "the effect, if any, of potential rezoning of the property." *Nashville Hous. Auth.*, 541 S.W.2d at 948.

The court observed that "the rule in Tennessee has long been stated to be that the [factfinder] must consider all capabilities of the property and *all the legitimate uses* for which it

is available and reasonably adapted." *Id.* at 950 (citations omitted) (emphasis added). The court concluded that potential rezoning was relevant to the determination of fair market value:

> [I]t is generally recognized that a use which is presently illegal may be considered, along with all presently available uses, in determining the value of property, if the restrictive law is *Malum prohibitum* rather than *Malum in se*, and, if there is a reasonable probability that the presently illegal use will be made legal in the future. When these conditions are met, it seems clear that, in determining value in condemnation proceedings, a use of land which is prohibited by existing zoning regulations may be considered.

*Id.* at 960 (citations omitted). Addressing what constitutes a "reasonable probability," the court held that the operative question is whether the possibility of rezoning has a measurable effect on the value of the property on the date of the taking. Thus, where evidence of possible rezoning is admitted, "the jury should be cautioned that they must not evaluate the property as though the possible rezoning were already an accomplished fact." *Id.* at 952. Instead, it was permitted to "take into account the effect, if any, which the possibility of rezoning has already had upon the fair market value of the property on the date of taking." *Id.* at 952; *see also State ex. rel. Comm'r of Dep't of Transp. v. Williams*, 828 S.W.2d 397, 400 (Tenn. Ct. App. 1991) ("Present zoning is but one of many factors to be considered in valuing the land taken. Zoning is not dispositive because zoning changes may be made reflecting the changing needs and circumstances of the community." (citations omitted)).

The holding in *Nashville Housing* effectively dictates the result here: contrary to PSC's argument, the fair market value of the Leased Premises should not necessarily be assessed based on a presumption that the property will remain zoned for industrial use, if there is a reasonable probability that it may be rezoned in the future. Nor, however, should the property necessarily be valued as if it had already been rezoned for mixed use. Rather, any assessment of fair market value should "take into account the effect, if any, which the possibility of rezoning ha[d] already

had upon the fair market value of the property" as of August 1, 2014, when the pertinent Lease period began. *Id.* at 952.

Seeking to avoid that conclusion, PSC argues that the Lease itself implicitly requires that PSC use the Leased Premises for industrial purposes only. Citing *Kyle v. J.A. Fulmer Trust*, No. W2008-00220-COA-R3-CV, 2008 WL 5156306 (Tenn. Ct. App. Dec. 9, 2008), PSC insists that "the lessee's guaranteed future use of the property, as a matter of law, must determine the valuation of the property." (Doc. No. 55, at 9.) It argues emphatically that, because it is required to preserve and maintain the buildings and improvements on the premises, it necessarily must continue to use those buildings and improvements for scrap metal recycling. (Doc. No. 80, at 21.)

In fact, although the tenant is required to "maintain" the buildings and improvements "in as good a condition and state of repair and preservation as at the commencement" of the Lease term (Lease ¶ 3), the Lease says nothing about the purpose to which the buildings and improvements—or the land itself—may or must be dedicated.[3] It does not prohibit PSC from constructing new buildings or from repurposing, modifying, or adding to existing buildings. PSC may sublease the premises or assign the Lease. Doing so requires the landowners' written permission, but such permission may not be unreasonably withheld. (Lease ¶ 7.)

Under Tennessee law, restrictions on the use of leased property must be express and not implied. *See, e.g.*, *Kroger Co. v. Chem. Sec. Co.*, 526 S.W.2d 468, 471 (Tenn. 1975) ("[C]ovenants restricting the use of leased property should be strictly construed according to their express terms and not expanded by implication." (citation omitted)). Other jurisdictions are uniformly in accord. *See, e.g.*, *Alchemy Commc'ns Corp. v. Preston Dev. Co.*, 558 S.E.2d 231,

---

[3] From the map submitted by the PSC, it appears that no buildings are constructed on the contiguous tracts that make up the bulk of the Leased Premises. (Doc. No. 58-2.)

235 (N.C. Ct. App. 2002) ("Use restrictions in leases will not be implied and will be construed against the landlord." (citations omitted)); *Chassereau v. Stuckey*, 342 S.E.2d 623, 624 (S.C. Ct. App. 1986) ("Ordinarily, in the absence of an exclusion of other purposes, a lease for a specific purpose will be regarded as permissive instead of restrictive and does not limit the use of the premises by the lessee to such purposes."); *Cox v. Ford Leasing Dev. Co.*, 316 S.E.2d 182, 183 (Ga. Ct. App. 1984) ("[O]rdinarily, in the absence of an exclusion of other purposes, a lease for a specific purpose is generally regarded as 'permissive' instead of 'restrictive,' and does not limit the use of the premises by the lessee to such purposes. . . .").

Thus, where rent is to be based on the fair market value of leased premises, the premises must be valued without a use restriction unless the lease expressly provides otherwise. For instance, in *Eltinge & Graziadio Development Co. v. Childs*, 122 Cal. Rptr. 369, 370 (Cal. Ct. App. 1975), the long-term lease expressly contemplated that the leased property would be developed as a shopping center and provided that no subleased space "shall at any time be used for sale of alcoholic beverages, pool or dance hall, distressed business; new or used vehicles or gambling or lottery activities or any unlawful activities." Rent was to be based in part on the calculation of 6% of the appraised value of the property. The court rejected the lessees' argument that "appraised value" meant the value of the land based upon its use as a shopping center. It held, instead, that the term "value" in a lease means "fair market value," unless the lease provides otherwise and that, even though the lease anticipated the development of the property as a shopping center, "none of its terms required the maintenance of a shopping center . . . nor do any of its terms exclude the use of the premises for a purpose other than those activities which are by its terms specifically excluded." *Id.* at 371–72.

Again, the Lease in this case contains no express restrictions on the tenant's (or any

subtenant's or assignee's) use of the property, and use restrictions cannot be implied from the requirement that the tenant maintain the buildings and improvements in good condition. *Kroger Co.*, 526 S.W.2d at 471. In short, PSC is not required to use the premises for a scrap metal operation or for industrial purposes.

### 2. The Effect of the Lease on the Fair Market Value

Insofar as PSC is implicitly arguing that the effect of the Lease must also be considered in determining the fair market value of the property for purposes of setting rent, the court rejects that argument, too, as unsupported by Tennessee law. In *Kyle v. J.A. Fulmer Trust*, the case upon which PSC relies most heavily, the Tennessee Court of Appeals was asked to construe "fair market value" as the term was used in a purchase option in a long-term lease. The court held that "fair market value must reflect the value of that which can be sold." *Kyle*, 2008 WL 5156306, at *8 (citation omitted). Consequently, the purchase price upon exercise of the option had to be based on the fair market value of the property as encumbered by the parties' lease. *See id.* ("Here, the property is encumbered by a 50-year lease with low rent. A purchaser would have to endure the lease and its low rent for more than 40 years before acquiring a fee simple estate. . . . Lessors own an estate encumbered by a long term lease, but they wish to sell an unencumbered fee simple. We agree . . . that the fair market value must reflect the value of that which can be sold." (internal citation and quotation marks omitted)). Other courts are largely in accord,[4] with

---

[4] *See, e.g.*, *Petula Assocs. v. Dolco Packaging Corp.*, 240 F.3d 499, 503–04 (5th Cir. 2001) (holding, under Texas law, that the effect of the lease must be considered, because "fair market value must reflect the value of that which can be sold," "absent explicit language indicating" otherwise); *TCC Enters. v. Estate of Erny*, 717 P.2d 936, 937 (Ariz. 1986) (where the tenant exercised its option to purchase the property when nineteen years remained on the long-term lease, holding that the fair market value of "the lessor's interest in [the] leased property is the value a purchaser would pay for what the owner-lessor has to sell, the fee subject to the lease").

some exceptions.[5]

*Kyle*, however, does not stand for the proposition that the effect of a lease on a property must be considered in determining *rent* based on fair market value of that property. For their part, the landowners point to a substantial body of caselaw holding that, when a lease sets rent based on a percentage of the fair market value of the leased property, fair market value must be determined without consideration of the effect of the lease on such value. For instance, in *Bullock's Inc. v. Security–First National Bank of Los Angeles*, 325 P.2d 185, 186 (Cal. Ct. App. 1958), rent for the initial ten-year renewal term of a lease was to be set at "an amount equal to five per cent of the appraised value of the leased land." The court held unequivocally that the effect of the lease should not be considered in determining the property's market value:

> While rental income is normally a proper factor to be considered in determining the value of property, it obviously cannot be considered when property is being appraised for the very purpose of determining the rent which should be paid. The rent cannot even be determined until a valuation of the land has been made. This principle is ably explained by the court in [*Springer v. Borden*, 71 N.E. 345, 346 (Ill. 1904)]:

> "The lease provided that the lessee should pay as rent a sum equal to 5 per cent of the cash value of the demised premises. . . . The value of anything, in the common understanding, is the value of the full title, and not a value over and above some incumbrance. The cash value of the lot . . . can mean nothing else than the value of the full title to the lot. According to the theory of complainant, a lease under very favorable terms to the lessee may be made still more favorable to him by showing that the terms of the lease depreciate the value of the reversion. A reduction in the value of the reversion would be equal to a reduction of rent, and the reduction of rent would reduce the value of the reversion, and so on in endless succession. The rule contended for is wholly impractical, for the reason that, as long as the net annual rental is unknown, the net value of the reversion cannot be ascertained, one of the necessary elements for fixing such value being lacking. No such plan for fixing the rentals could have been anticipated by the parties."

---

[5] *See Ocean Petroleum, Co. v. Yanek*, 5 A.3d 683, 692 (Md. 2010) (concluding that the purchase option in the lease specifically contemplated a transaction between the lessor and lessee and required the lessor to "convey the property by a good and merchantable title to the Tenant free of liens and encumbrances," and, therefore, that the lease should not be considered in determining the value of the property).

*Id.* at 191. Most of the opinions that address this precise issue have followed suit.[6] Moreover, contrary to PSC's argument, none of the referenced opinions suggests that the incorporation of the buildings and improvements on the property within the definition of the leased premises changes the outcome of the analysis.

This court finds the reasoning in *Bullock's* to be persuasive and believes that, if presented with this issue, Tennessee courts would agree. The court therefore holds that, because the Lease does not expressly provide otherwise, the fair market value of the Leased Premises should not take into account the effect of the Lease on the value.

### 3. Conclusion: PSC's Motion

PSC's motion asks whether a fair market value appraisal of the Leased Premises *must* be based on its current zoning for industrial use and, implicitly, whether an appraisal must account for the effect of the long-term lease on the value of the premises. Because the court has concluded that the answer to both questions is no, PSC's motion must be denied.

---

[6] *See, e.g.*, *STL 300 N. 4th, LLC v. Value St. Louis Assocs.*, 540 F.3d 788, 790, 793 (8th Cir. 2008) (where a lease required recalculating rent at various points during the 99-year lease term at six percent of the "then appraised value of the demised premises," defining the term "demised premises," based on consideration of the entirety of the lease, as "a hypothetical fee simple interest in the land, or the value of the land without consideration of the effect of the ground lease"); *First Nat'l Bank of Mobile v. Duckworth*, 502 So.2d 709, 712 (Ala. 1987) ("Based upon sound reasoning from other jurisdictions and the logical intentions of the parties, we hold that the existence of the lease itself should not be considered in determining the value of the leased premises."); *Eltinge & Graziadio Dev. Co.*, 122 Cal. Rptr. at 371 ("The term that 'there shall be periodic appraisals made of the demised premises . . .' . . . means appraisals of the fair market value of the demised premises in accordance with its highest and best use as if vacant and without regard to the terms and conditions of the subject ground lease."); *Schipper & Block, Inc., v. Carson Pirie Scott & Co.*, 256 N.E.2d 854, 860 (Ill. App. Ct. 1970) (holding that it was "improper and unfair to the lessor" for an appraiser to have "tak[en] into consideration as a depreciating factor the influence of the lease itself which required reappraisals every ten years"). PSC cites one case that reached a contrary conclusion, *936 Second Ave. L.P. v. Second Corporate Development Co.* Inc., 891 N.E.2d 289 (N.Y. 2008), but that case appears to be an outlier.

### C.    The Landowners' Motion

As indicated above, the landowners "seek a partial summary judgment that the property must be appraised not for a limited industrial use, but in fee simple at its highest and best use." (Doc. No. 72, at 2.) They also insist that the court's decision is "binary: either the property is appraised for industrial use (as PSC contends), or the property is appraised in fee simple at its highest and best use (as the Landowners contend)." (*Id.* at 6.)

The decision is not exactly binary. The landowners' motion actually incorporates three questions, only the first two of which mirror the questions posed by PSC's motion: (1) whether the Leased Premises must be appraised as zoned for industrial use and (2) whether the Leased Premises must be appraised in fee simple. The landowners' motion also asks whether the property must be appraised at its "highest and best use."

With respect to the first question, the court has already determined that the Leased Premises should not *necessarily* be appraised for industrial use only, but that the effect of the probability of rezoning on the value of the premises—land and improvements together—may be taken into account. To the extent that the landowners' motion asks for a judgment that there is no requirement that the land be appraised for industrial use only, the motion will be granted.

Second, the court has determined that the effect of the Lease on the value of the property is not a valid consideration. The land should be appraised in fee simple.[7] In that regard as well, the motion will be granted.

Third, the landowners' motion, taken at face value, simply asks for a declaration that the property must be appraised based on its highest and best use. PSC agrees that it should: "Although Landowners concede, as they must, that the Leased Premises must be appraised based

---

[7] "Fee simple" is defined as "the broadest property interest allowed by law" and is also termed, among other things, "exclusive ownership." Black's Law Dictionary (10th ed. 2014).

on highest and best use, they ignore the limitations that are integral to its application." (Doc. No. 80, at 6.) In other words, there is no dispute as to *whether* the premises must be appraised at highest and best use, but there appears to be a dispute as to what that term means and what factors, specifically, may be considered in assessing highest and best use.[8]

The landowners do not define "highest and best use" for purposes of an appraisal or cite to any Tennessee law establishing that fair market value in the context of a lease dispute depends on a property's highest and best use. PSC defines the term as "the reasonably probable and legal use of an improved property which is physically possible, appropriately supported, financially feasible and that which results in its highest value, i.e., most profitable." (Doc. No. 80, at 6 (quoting *In re Custom Distrib. Servs.*, 216 B.R. 136, 157 (Bankr. D.N.J. 1997) (discussing highest and best use in the context of valuation for tax assessment purposes), *reversed in part*, 224 F.3d 235 (3d Cir. 2000)).) However, "totally conjectural or speculative potential use may not be considered in determining the highest and best use, for a determination of highest and best use must reflect only 'potential development that could with reasonable certainty be expected with respect to the property.'" (Doc. No. 80, at 7 (quoting *City of Hildale v. Cook*, 28 P.3d 697, 703 (Utah 2001) (discussing market value and highest and best use in the land condemnation context)).)

Tennessee law on highest and best use is somewhat confusing, as the courts appear to define the term narrowly as a single—usually hypothetical—use but, in the eminent domain arena, at least, have consistently held that fair market value should *not* be based solely on a *particular* "highest and best use." *See, e.g.*, *Love v. Smith*, 566 S.W.2d 876, 878 (Tenn. 1978) ("[I]n determining what constitutes fair cash market value, the jury must consider all capabilities

_____

[8] Clearly, there is also a factual dispute as to what the Leased Premises' highest and best use is, but the parties' motions do not call upon the court to resolve that dispute at this juncture.

of the property and all the legitimate uses for which it is available and reasonably adapted. Thus, it is improper to base the value of land solely upon its use for a particular purpose, such as, 'its highest and best use.'"). Tennessee courts refer to this principle as the "*Davidson County* rule," from *Davidson County Board of Education v. First American National Bank*, 301 S.W.2d 905, 908 (Tenn. 1957). In that case, the land at issue "had not been plotted or subdivided into building lots with roads . . . through it prior to the time that it was taken." 301 S.W.2d at 906. The trial court had excluded the testimony of an engineer who had prepared a plat for the "admitted purpose of illustration and persuasion in connection with these condemnation proceedings." *Id.* All of the landowners' witnesses had

> geared their testimony to this plat and to the conception that this subdivision which was not in existence prior to the taking of this property . . . was subdivided into lots. The offering of this plat and the evidence in connection therewith was based on the proposition that the plat and the evidence in connection therewith was attempting to tie this tract of land down to a particular subdivision and one that was not in existence but was imaginary and was created only for the purpose of this condemnation proceeding.

*Id.* at 906–07. Even though both parties submitted proof of the potential use of the land for "residential subdivision purposes," *id.* at 909, the Tennessee Supreme Court held that the trial court had appropriately excluded the testimony of the landowner's expert, because it improperly "hinged . . . on the value of this piece of land purely for one purpose." *Id.* The court noted that Tennessee had "adopted the view that 'value in view of all available uses' is the proper phrase to use in valuation as against the phrase 'value for the best use' . . . . It is well said that we use this phrase to warn the jury against awarding the 'value for a particular use.'" *Accord Ocoee Util. Dist. v. The Wildwood Co.*, No. E2016-00382-COA-R3-CV, 2016 WL 5831595, at *9 (Tenn. Ct. App. Oct. 6, 2016) (holding that the trial court improperly permitted expert evidence on the fair market value of a property based solely upon what the defendant's expert considered to be its

one best and highest use—the sale of water—"rather than the fair market value of the property giving due consideration to all the capabilities of the property and all the uses to which it could be applied" (citing *Davidson Cnty.*, 301 S.W.2d at 909)); *City of Gatlinburg v. Fox*, No. 03A01-9606-CV-00199, 1996 Tenn. App. LEXIS 752, at *15 (Tenn. Ct. App. Nov. 22, 1996) (finding that the defendant's expert improperly testified that the sole highest and best use of the condemned property was as a landfill); *Memphis Hous. Auth. v. Mid-South Title Co.*, 443 S.W.2d 492, 501 (Tenn. Ct. App. 1968) (reversing jury verdict due to the parties' and some of the expert witnesses' having placed "so much emphasis" on the value of the condemned property for potential use as a motel that the jury was probably influenced by the specific value stated for motel purposes).

In the Sixth Circuit, it is well established that, in the condemnation context, "the landowner is to be compensated for the fair market value of his property upon the basis of the property's highest and best use." *United States v. 1,291.83 Acres of Land*, 411 F.2d 1081, 1084 (6th Cir. 1969). However, when a proposed highest and best use is a hypothetical, possible future use, the federal courts, like the Tennessee courts, are in accord that the land's valuation should not be based *solely* on some single possibility, although that possible use may be taken into consideration. *See id.* ("In determining value, the highest and most profitable use for which the property is adaptable and needed, or is likely to be needed in the near future, is to be considered. That is, the highest and best use of the property can be based upon reasonable future probability. All considerations that might fairly be brought forward and given substantial weight in bargaining between an owner willing to sell and a purchaser desiring to buy should be considered and taken into account." (internal citations omitted)). Likewise, as the Supreme Court has stated:

> The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held.

*Olson v. United States*, 292 U.S. 246, 255 (1934), *quoted in United States v. Certain Land Situated in City of Detroit*, 450 F.3d 205, 210 (6th Cir. 2006).

In sum, consistent with Tennessee law, the fair market value appraisal of the Leased Premises should not be based solely on a particular hypothetical purpose, but it should based on a consideration of the property's highest and best use under the broad construction given that term under federal law. In this regard, too, the landowners' motion must be granted. In making the assessment of highest and best use, "[a]ll considerations that might fairly be brought forward and given substantial weight in bargaining between an owner willing to sell and a purchaser desiring to buy should be considered and taken into account." *1,291.83 Acres*, 411 F.2d at 1084. This likely includes the fact that the land lies in a flood plain, as well as the possibility of rezoning and development "in the reasonably near future[,] . . . to the full extent that the prospect of demand for such use affects the market value." *Olson*, 292 U.S. at 255. The assessment must be performed based on the value as of August 1, 2014, the date the last period of the initial Lease Term commenced, and on the circumstances and market conditions in effect as of that date. (Lease ¶ 3.a.)

## IV.      CONCLUSION

For the reasons set forth herein, PSC's motion (Doc. No. 54) will be denied and the landowners' motion (Doc. No. 72), granted. An appropriate order is filed herewith.

ALETA A. TRAUGER
United States District Judge